# STATE OF MICHIGAN

# COURT OF APPEALS

---

FAZLUL SARKAR,

        Plaintiff-Appellant,

v

JOHN DOE,

        Defendant-Appellee,

and

JANE DOE

        Defendant,

and

PUBPEER FOUNDATION,

        Appellee.

FOR PUBLICATION
December 6, 2016
9:00 a.m.

No. 326667
Wayne Circuit Court
LC No. 14-013099-CZ

---

FAZLUL SARKAR,

        Plaintiff-Appellee,

v

JOHN DOE and JANE DOE,

        Defendants,

and

PUBPEER FOUNDATION,

        Appellant.

No. 326691
Wayne Circuit Court
LC No. 14-013099-CZ

---

-1-

Before:  FORT HOOD, P.J., and GLEICHER and O'BRIEN, JJ.

O'BRIEN, J.

The issues presented in these appeals boil down to one simple question:  Are the identities of anonymous scientists who comment on other scientists' research online protected by the First Amendment?

## I.  FACTUAL & PROCEDURAL BACKGROUND

According to his complaint, "Fazlul H. Sarkar, PhD is a distinguished professor of pathology at Karmanos Cancer Center, Wayne State University with a track record of cancer research over 35 years."[1]  Dr. Sarkar began his research at Wayne State University in 1989, and "his work has led to the discovery of the role of chemopreventive agents in sensitization of cancer cells (reversal of drug resistance) to conventional therapeutics (chemo-radio-therapy)."  Dr. Sarkar alleges that "[h]e is a perfect example of a true translational researcher bringing his laboratory research findings into clinical practice," that he "is involved in several collaborative projects including breast, lung, and pancreatic cancer," that "[h]e has published over 430 original scientific articles in peer-reviewed journals," that he has written or reviewed hundreds of articles and book chapters, that he has edited several books, that he has received numerous publically funded grants, and that he has trained a variety of pre- and post-doctoral students.  In short, it appears undisputed that he is well-accomplished in the cancer-research community.

It is presumably these accomplishments that led to Dr. Sarkar pursuing employment with the University of Mississippi in 2013.  According to Dr. Sarkar, the University of Mississippi presented him with the "anticipated terms of an offer of a position" in September 2013, which set forth several terms of employment, including, most notably, tenure, a $350,000 salary, $15,000 in relocation expenses, "[a] start up package of $750,000," and a variety of other benefits.  In March 2014, the University of Mississippi formally offered him this position, Dr. Sarkar accepted, and he resigned from Wayne State University approximately two months later.  Dr. Sarkar relocated to Oxford, Mississippi, shortly thereafter and was set to begin his employment with the University of Mississippi in July 2014.  At some point, however, "his start date was adjusted to August 1, 2014 per later agreement and approval . . . ."

On June 19, 2014, however, the University of Mississippi rescinded Dr. Sarkar's offer of employment.  According to Dr. Sarkar, the University of Mississippi was unwilling to "go forward with an employment relationship with [him] and [his] group" based on "allegations lodged in a public space and presented directly to colleagues [t]here . . . ."  In pertinent part, the University of Mississippi's personnel cited public comments made on pubpeer.com, which were

---

[1] All quotations in Section I of our opinion are from the pleadings submitted by the parties before the trial court.  In reviewing a trial court's decision on a motion for summary disposition pursuant to MCR 2.116(C)(8), we are required to accept the factual allegations in the pleadings, including in the complaint, as true; thus, quoting the pleadings is appropriate.

apparently made known to the University of Mississippi by an anonymous individual.[2]  After losing this employment opportunity with the University of Mississippi, Dr. Sarkar attempted to rescind his resignation with Wayne State University the following day, on June 20, 2014, and Wayne State University allowed him to return, albeit in a non-tenured position.  Once he learned he would be returning to Wayne State University, however, either the same or a different anonymous individual also distributed a flyer containing a screenshot from pubpeer.com to Wayne State University personnel.[3]

Obviously unhappy with the outcome of his employment offer with the University of Mississippi, the comments on pubpeer.com, and the distribution of the flyer to Wayne State University personnel, Dr. Sarkar pursued a variety of legal remedies including this lawsuit.  On October 9, 2014, Dr. Sarkar filed this five-count lawsuit against "John and/or Jane Doe(s)."  Dr. Sarkar alleged, in pertinent part, that the comments made on pubpeer.com were defamatory, that the comments made on pubpeer.com and forwarded to the University of Mississippi intentionally interfered with a business expectancy, that the comments made on pubpeer.com and forwarded to Wayne State University intentionally interfered with a business relationship, that the posting of an email from Wayne State University personnel on pubpeer.com and in public constituted an invasion of privacy, and that the circulation of the flyer was intended to inflict emotional distress.

In an attempt to learn the identities of the individual or individuals who were responsible for the actions at issue, Dr. Sarkar subpoenaed the PubPeer Foundation ("PubPeer"), the entity that operates pubpeer.com, seeking the following:  "All identifying information, including but not limited to user names, IP addresses, email addresses, profile information, and any other identifying characteristics of all users who have posted any of the comments that were posted on your web site that are described in the attached complaint that was filed in Wayne county, MI."  Although somewhat unclear from his complaint and subpoena, it appears that Dr. Sarkar sought all identifying information for approximately 30 comments made on pubpeer.com about his research.  PubPeer objected, moving to quash the subpoena on First Amendment grounds.

Specifically, PubPeer argued that, in order to unmask the identity of the anonymous commenter or commenters, Dr. Sarkar was required to prove that his claims could survive a motion for summary disposition.  Asserting that Dr. Sarkar had failed to do so, PubPeer argued that the trial court should quash the subpoena.[4]  Analyzing each comment at issue, PubPeer also

---

[2] According to Dr. Sarkar's complaint, "Pubpeer.com . . . is a web site that describes itself as 'an online community that uses the publication of scientific results as an opening for fruitful discussion among scientists.' "  Pubpeer.com appears to have been created by anonymous scientists, and scientists are permitted to comment on pubpeer.com anonymously as well.

[3] The contents of the flyer are discussed further below.

[4] PubPeer also argued that Michigan courts should require that plaintiffs in defamation cases put forth evidence establishing a prima facie case of defamation before unmasking the identities of anonymous commenters as other jurisdictions have done.  See, e.g., *Dendrite Int'l, Inc v Doe, No 3*, 342 NJ Super 134, 141-142; 775 A2d 756 (2001) ("*Dendrite*"); see also *Doe No 1 v Cahill*,

argued that Dr. Sarkar failed to adequately plead the allegedly defamatory comments, that the allegedly defamatory comments were not capable of defamatory meaning, that the communications sent to or distributed at the universities were insufficiently connected to PubPeer, and that the balance of interests in this case favored preserving scientists' ability to anonymously comment on other scientists' research.

Dr. Sarkar responded, arguing that "[t]his case is not about free speech." Rather, he asserted, "[i]t is about tortious conduct that is destroying a man's life and career." Dr. Sarkar described the anonymous commenter or commenters as "an enemy [or enemies] hiding behind the anonymity afforded by the internet" who is or are "sabotaging" his career. Dr. Sarkar, relying on the fact that one John Doe had already filed an appearance, argued that no preliminary showing was required and that, at best, the appearing John Doe could seek a protective order on behalf of him or herself. Dr. Sarkar also pointed to the fact that his complaint was adequate, that he alleged torts beyond defamation, that the confidential nature of misconduct proceedings had been breached, that the comments at issue are defamatory, and, ultimately, that disclosure of the commenters' identities is necessary to seek the legal remedy that he is entitled to.

A hearing on PubPeer's motion to quash was held on March 5, 2015. After hearing arguments similar to those discussed above, the trial court granted, in part, PubPeer's motion to quash.[5] Specifically, the trial court granted the motion in full with the exception of one subparagraph in Dr. Sarkar's complaint: Subparagraph 40(c). As it relates to subparagraph 40(c), the trial court reserved its ruling as it related to that specific subparagraph for a later date after the parties were afforded additional time for supplemental briefing. A second hearing on Pubpeer's motion to quash was held two weeks later, on March 19, 2015. After reviewing the parties' supplemental briefs and hearing additional argument, the trial court denied PubPeer's motion to quash with respect to subparagraph 40(c).[6] These appeals followed. On April 20, 2015, the trial court granted PubPeer's motion to stay proceedings pending the outcome of these appeals.

---

884 A2d 451, 460-461 (Del, 2005) ("*Cahill*"). PubPeer, John Doe (an anonymous defendant who has filed an appearance and is a party to this appeal), and amici (Google, Inc. and Twitter, Inc., Public Citizen, Inc., and Dr. Bruce M. Alberts and Dr. Harold E. Varmus) raise this same argument on appeal. However, as indicated below and acknowledged by those parties, this Court has declined to do so in the past, and we are bound by that decision. MCR 7.215(J)(1).

[5] An order reflecting the trial court's decision was entered on March 9, 2015, and it is that order that Dr. Sarkar challenges on appeal in Docket No. 326667. This Court granted Dr. Sarkar's application for leave to appeal in Docket No. 326667 on August 27, 2015. *Fazlul Sarkar v John Doe*, unpublished order of the Court of Appeals, entered August 27, 2015 (Docket No. 326667).

[6] An order reflecting the trial court's decision was entered on March 26, 2015, and it is that order that PubPeer challenges on cross-appeal in Docket No. 326691. This Court granted PubPeer's application for leave to appeal in Docket No. 326691 on August 27, 2015. *Fazlul Sarkar v John Doe*, unpublished order of the Court of Appeals, entered August 27, 2015 (Docket No. 326691).

-4-

## II. ARGUMENTS ON APPEAL

Generally, we review a trial court's decision on whether to compel discovery for an abuse of discretion. *Cabrera v Ekema*, 265 Mich App 402, 406; 695 NW2d 78 (2005). We review a trial court's decision to grant summary disposition de novo, however. *Maiden v Rozwood*, 461 Mich 109, 118; 597 NW2d 817 (1999). Similarly, constitutional issues, including the application of the First Amendment, are also reviewed de novo. *Smith v Anonymous Joint Enterprise*, 487 Mich 102, 111-112; 793 NW2d 533 (2010).

## A. THE APPROPRIATE STANDARD

On appeal, Dr. Sarkar first argues that the trial court's March 9, 2015 order must be reversed because the court erred in allowing PubPeer, a nonparty, to argue standards for summary disposition. Relatedly, Dr. Sarkar also argues that that the trial court erroneously heightened the pleading standard for defamation as well as erroneously refused to consider a protective order pursuant to MCR 2.302. Ultimately, these arguments are each part of Dr. Sarkar's ultimate position before the trial court and before this Court on appeal: Dr. Sarkar argues that *Thomas M Cooley Law Sch v Doe 1*, 300 Mich App 245; 845 NW2d 128 (2013), not *Ghanam v John Does*, 303 Mich App 522; 833 NW2d 331 (2014), controls the outcome of this case. We will address each case, as well as their application to this matter, in turn.

### 1. *THOMAS M COOLEY LAW SCHOOL V DOE 1 ("COOLEY")*

In *Cooley*, an anonymous speaker created a website titled "THOMAS M. COOLEY LAW SCHOOL SCAM" on weebly.com. 300 Mich App at 250. The speaker, who identified himself as a graduate of Thomas M. Cooley Law School ("Cooley" or "the school"), described the school as "THE BIGGEST JOKE of all law schools," characterized the school as having an " 'open door' policy" for admission, criticized the school's attrition rate and administrative policies, cited rankings, described the school as " 'A DIPLOMA MILL,' " and called the school's graduates "unemployed." *Id*. at 251. The speaker "permitted visitors to post their own comments on the website, and frequently responded to the commentators," but he eventually "began to 'filter' comments, noting that he would delete 'any stupid or irrelevant comments or personal attacks[.]' " *Id*. (alterations in original).

Cooley eventually filed a lawsuit against multiple anonymous defendants, alleging defamation against the anonymous speaker who created the website as well as the other anonymous commenters, and subpoenaed Weebly, Inc. ("Weebly"), the entity that operates weebly.com, "ordering it to produce documents that included [the speaker]'s user account information." *Cooley*, 300 Mich App at 251-252. The anonymous speaker moved to quash the subpoena or for a protective order, but, in the meantime, an employee of Weebly apparently disclosed the speaker's identity to the school. *Id*. at 252. After learning the speaker's identity, the school filed an amended complaint identifying him by his legal name. *Id*. In addressing the speaker's motion to quash or for a protective order, the trial court first struck the school's amended complaint and ordered that the school not continue discovery or disclose the speaker's identity further. *Id*. at 252-253. Ultimately, however, the trial court denied the speaker's motion to quash, reasoning that the speaker's statements at issue were slanderous per se and, thus, not entitled to First Amendment protection under *Dendrite* and *Cahill*. *Id*. at 253.

The speaker appealed, and this Court reversed and remanded. *Cooley*, 300 Mich App at 272. Specifically, this Court held that the trial court abused its discretion by applying *Dendrite* and *Cahill* rather than Michigan law as well as erred in making other conclusions. *Id*. at 267-269. This Court explained, in pertinent part, as follows:

We conclude that the trial court abused its discretion, which requires reversal. A trial court by definition abuses its discretion when it inappropriately interprets and applies the law. First, the trial court erroneously concluded that Michigan law does not adequately protect [the speaker]'s interests, and then it erroneously adopted and applied foreign law. Second, the trial court's findings and conclusions in support of its position were erroneous. Third, the trial court did not state any reason supporting its decision to deny [the speaker]'s alternative request for a protective order.

After adopting the *Dendrite* and *Cahill* standards as Michigan law, the trial court appears to have considered only two alternatives: (1) that the subpoena should be quashed and Cooley's case dismissed, or (2) that the subpoena should not be quashed and the case should proceed with [the speaker]'s name on the complaint. But Michigan law does not address only these polar opposites. [The speaker] also asked for a protective order under MCR 2.302(C). The trial court's order indicates that it denied [the speaker]'s requests for a protective order "for reasons stated on the record." But the trial court did not state any reasons on the record to deny the protective order. The trial court appears not to have considered whether or to what extent to protect [the speaker]'s identity after it determined not to quash the subpoena. On remand, the trial court should consider whether good cause exists to support [the speaker]'s request for a protective order.

Next, the trial court ruled that defamatory statements per se were not entitled to First Amendment protections. The trial court was incorrect. Not all accusations of criminal activity are automatically defamatory. To put it simply, defamation per se raises the presumption that a person's reputation has been damaged. In that instance, a plaintiff's failure to prove damages for certain charges of misconduct would not require dismissal of the suit. Whether a plaintiff has alleged fault—which may require the plaintiff to show actual malice or negligence, depending on the status of the speaker and the topic of the speech— concerns an element separate from whether the plaintiff has alleged defamation per se. Thus, the trial court erroneously concluded that Cooley would not have to prove fault or other elements because the statements were defamatory per se.

More importantly, this erroneous determination was central to the considerations the trial court may balance when determining whether to issue a protective order. As noted above, a trial court may consider that a party seeking a protective order has alleged that the interests he or she is asking the trial court to protect are constitutionally shielded. But the trial court need not, and should not, confuse the issues by making a premature ruling—as though on a motion for summary disposition—while considering whether to issue a protective order before the defendant has filed a motion for summary disposition. The trial court

-6-

should only consider whether good cause exists to issue a protective order, and to what extent to grant relief under MCR 2.302(C).

[The speaker] urges this Court to rule that Cooley has not pleaded legally sufficient claims for defamation and tortious interference with a business relationship. We conclude that [the speaker]'s motion for a protective order did not present the appropriate time or place to do this. These rulings are best made in the context of a motion for summary disposition, when the trial court is testing the legal sufficiency of the complaint. The trial court's only concerns during a motion under MCR 2.302(C) should be whether the plaintiff has stated good cause for a protective order and to what extent to issue a protective order if it determines that one is warranted. [*Id*.]

## 2. *GHANAM V JOHN DOES ("GHANAM")*

In *Ghanam*, several anonymous speakers made what the plaintiff characterized as "false and malicious statements about plaintiff on an Internet message board called The Warren Forum." 303 Mich App at 525. The statements at issue included allegations that the plaintiff was "involved in the disappearance and theft of approximately 3,647 tons of road salt from city storage facilities and of stealing tires from city garbage trucks and selling them." *Id*. Taking the position that these statements " 'prejudiced and caused harm to the Plaintiff in his reputation and office and held Plaintiff up to disgrace, ridicule, and contempt,' " plaintiff filed a defamation lawsuit against the anonymous speakers and sought to depose a former city employee who "plaintiff believed . . . was affiliated with the website" to learn the speakers' identities. *Id*. at 525, 527.

The former city employee, a nonparty, "moved for a protective order, arguing that the First Amendment protects a critic's right to anonymously comment about the actions of a public official and that the identities of the anonymous writers were subject to a qualified privilege." *Ghanam*, 303 Mich App at 527. Specifically, the former city employee "argued that before plaintiff could seek to compel the identification of the anonymous posters, he must produce sufficient evidence supporting each element of a cause of action for defamation against a public figure." *Id*. The trial court, without "consider[ing] or acknowledg[ing] the First Amendment aspects involved," "merely relied on the open and liberal discovery rules of Michigan" and denied the motion for a protective order. *Id*. at 527-528.

The former city employee appealed, and this Court reversed and remanded for further proceedings. *Ghanam*, 303 Mich App at 550. First, while it recognized that it was bound by *Cooley*, this Court nevertheless found that "application of the *Cooley* protections scheme in the instant case, containing circumstances which *Cooley* declined to address, appears inadequate to protect the constitutional rights of an anonymous defendant who is unaware of pending litigation." *Id*. at 540. In light of this inadequate protection, this Court "conclude[d] that when an anonymous defendant in a defamation suit is not shown to be aware of or involved with the lawsuit, some showing by the plaintiff and review by the trial court are required in order to balance the plaintiff's right to pursue a meritorious defamation claim against an anonymous critic's First Amendment rights." *Id*. Consequently, this Court "impose[d] two additional requirements in an effort to balance" these competing interests: (1) "a plaintiff must have made

reasonable efforts to provide the anonymous commenter with reasonable notice that he or she is the subject of a subpoena or motion seeking disclosure of the commenter's identity," and (2) "the plaintiff's claims must be evaluated by the court so that a determination is made as to whether the claims are sufficient to survive a motion for summary disposition under MCR 2.116(C)(8)." *Id*. at 541. Determining that there was nothing in the record that would satisfy either of those two additional requirements, this Court reversed and remanded for the entry of an order granting summary disposition in the anonymous speakers' favor. *Id*. at 543-550.

### 3. APPLICATION TO THIS CASE

In our view, this case does not fit neatly into the framework articulated by *Cooley* or *Ghanam*. As Dr. Sarkar argues, *Cooley* is similar in that it involved a defendant who had appeared. As PubPeer argues, however, *Cooley* differs in that it involved a defendant whose identity had already been disclosed to the plaintiff. That is, to date, the identities of the anonymous speakers in this case are not yet known by plaintiff.[7] On the other hand, as PubPeer argues, *Ghanam* is similar in that it involved a defendant whose identity had not yet been disclosed to the plaintiff. As Dr. Sarkar argues, however, *Ghanam* differs in that it involved a situation where seemingly no defendants were aware of nor had appeared in the matter. That is, as of now, one anonymous defendant is aware of and has filed an appearance in this matter. Thus, the protections schemes articulated in *Cooley* and *Ghanam*, while helpful, do not control the outcome of this case.

Nevertheless, it is our opinion that the framework as set forth in *Ghanam* is most appropriate here. In essence, Dr. Sarkar's position is simple: He argues that because a defendant has appeared, PubPeer cannot argue the standards for summary disposition standards. We cannot agree with this position.

"The First Amendment of the United States Constitution provides that 'Congress shall make no law . . . abridging the freedom of speech . . . .' " *Cooley*, 300 Mich App at 255-256, quoting US Const, Am I. Similarly, our "Michigan Constitution provides that '[e]very person may freely speak, write, express and publish his views on all subjects, being responsible for the abuse of such right; and no law shall be enacted to restrain or abridge the liberty of speech . . . .'

---

[7] Additionally, and perhaps more importantly, *Cooley* is distinguishable from this matter in that *Cooley* involved a motion to quash or for a protective order filed by the anonymous speaker at issue, not a nonparty. 300 Mich App at 252 ("On August 5, 2011, Doe 1 filed a motion in the Ingham Circuit Court, requesting that it quash any outstanding subpoenas to Weebly or, alternatively, issue a protective order limiting or restricting Cooley's use or disclosure of his identifying information."). Conversely, this case involves a motion to quash by a nonparty relating, at least in part, to statements made by anonymous speakers who have not appeared. Thus, while *Cooley* is still helpful to our analysis in this case, the circumstances presented in that case are not identical to those here as Dr. Sarkar claims.

" *Id*. at 256, quoting Const 1963, art 1, § 5 (alterations by the *Cooley* Court).[8]  The United States Constitution protects an individual's "speech over the Internet to the same extent as speech over other media," and this remains true regardless of whether the individual identifies him or herself or remains anonymous.  *Id*.  Stated again, "The United States Supreme Court has . . . determined that 'an author's decision to remain anonymous, like other decisions concerning omissions or additions to the content of a publication, is an aspect of the freedom of speech protected by the First Amendment.' "  *Id*., quoting *McIntyre v Ohio Elections Comm*, 514 US 334, 342; 115 S Ct 1511; 131 L Ed 2d 426 (1995).  However, "[t]he right to anonymous expression over the Internet does not extend to defamatory speech, which is not protected by the First Amendment." *Ghanam*, 303 Mich App at 534.

While courts in other jurisdictions have tried, "[t]o very different extents," "to balance a defendant's right to speak anonymously against a plaintiff's interest in discovering the information necessary to prosecute its defamation claims," *Cooley*, 300 Mich App at 257, this Court has clearly held "that Michigan's procedures for a protective order, when combined with Michigan's procedures for summary disposition, adequately protect a defendant's First Amendment interests in anonymity," *id*. at 264, and we are bound by that decision.  MCR 7.215(J)(1).[9]  Thus, as recognized by *Cooley*, it is this state's procedures for protective orders and summary disposition that control in this circumstance.  300 Mich App at 259-264.

A party commences a civil action when he or she files a complaint with the court. *Cooley*, 300 Mich App at 259.  After doing so, a party is permitted to " 'obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action[.]' "  *Id*. at 260, quoting MCR 2.302(B)(1) (alteration by the *Cooley* Court). Generally speaking, "Michigan follows a policy of open and broad discovery."  *Id*. Nevertheless, "a trial court should protect parties from excessive, abusive, or irrelevant discovery requests" by issuing a protective order.  *Id*. at 260-261.  In deciding whether to do so, i.e., whether to issue a protective order, courts turn to the procedure set forth in MCR 2.302(C).  *Id*. at 261.  Relatedly, courts may also grant summary disposition to one party when the opposing party has failed to state a viable claim pursuant to MCR 2.116(C)(8).  *Id*.  Summary disposition pursuant to MCR 2.116(C)(8) should be granted "if the claim is so clearly unenforceable as a matter of law that no factual development could possibly justify the opposing party's right to recovery."  *Id*. at 262.  As this Court explained in *Cooley*, "[t]he availability and application of summary disposition is important in this case because summary disposition is an essential tool to protect First Amendment rights."  *Id*.

---

[8] Because "[t]he United States and Michigan Constitutions provide the same protections of the freedom of speech," "this Cout may consider federal authority when interpreting the extent of Michigan's protections of free speech."  *Cooley*, 300 Mich App at 256.

[9] In *Cooley*, a panel of this Court expressly refused to adopt *Dendrite*, reasoning that any expansion beyond the Michigan rules of civil procedure would be better-suited for the Legislature.  300 Mich App at 266-267.

However, when an anonymous defendant has not appeared, it is clear that he or she is completely unable to seek summary disposition on unviable claims; stated differently, when an anonymous defendant has not appeared, it is clear that he or she is completely unable to utilize an (and arguably the most) important tool to protect his or her First Amendment rights. This is precisely the concern that was identified in *Ghanam*:

> In the present case, no defendant was notified of the lawsuit and no defendant had been involved with any of the proceedings, which means that there was no one to move for summary disposition under MCR 2.116(C)(8). Thus, one of the two protections that *Cooley* relied upon is conspicuously absent. Further, when defendants are not aware of and not involved with a lawsuit, any protection to be afforded through the entry of a protective order under MCR 2.302(C) is *contingent* upon a nonparty, e.g., the Internet service provider, asserting the defendants' First Amendment rights. Thus, application of the *Cooley* protections scheme in the instant case, containing circumstances which *Cooley* declined to address, appears inadequate to protect the constitutional rights of an anonymous defendant who is unaware of pending litigation. [303 Mich App at 539-540 (emphasis in original).][10]

Consequently, under *Ghanam*, "some showing by the plaintiff and review by the trial court are required in order to balance the plaintiff's right to pursue a meritorious defamation claim against an anonymous critic's First Amendment rights." 303 Mich App at 540. In this case, that requires that plaintiff satisfy the two additional requirements imposed by the *Ghanam* panel and set forth above: (1) Dr. Sarkar "must have made reasonable efforts to provide the anonymous commenter with reasonable notice that he or she is the subject of a subpoena or motion seeking disclosure of the commenter's identity," and (2) Dr. Sarkar's "claims must be evaluated by the court so that a determination is made as to whether the claims are sufficient to survive a motion for summary disposition under MCR 2.116(C)(8)." *Id*. at 541. With respect to the "reasonable notice" requirement, there is no dispute in this case that reasonable notice was

---

[10] As indicated above, Dr. Sarkar argues on appeal that the appearance of one anonymous speaker, in and of itself, renders *Ghanam* wholly inapplicable. We cannot agree. The practical implications of such an understanding are unacceptable. In essence, that understanding would require that the appearing anonymous speaker represent the interests of all anonymous speakers, and that is simply unacceptable in cases, such as this one, where the anonymous speakers made different statements. There is simply no legal authority that would support a conclusion that the appearance of one anonymous speaker somehow affects the anonymity protections afforded to other anonymous, but non-appearing, speakers simply because they happened to comment on the same website. Furthermore, Dr. Sarkar's position overlooks the fact that *Ghanam* expressly held that a motion for summary disposition, whether it be made by an anonymous speaker or a nonparty, is not required: "This evaluation is to be performed *even if there is no pending motion for summary disposition before the court*." 303 Mich App at 541 (emphasis added). Thus, the trial court was required to perform this evaluation regardless of whether PubPeer, an anonymous speaker, or any other individual or entity moved for summary disposition.

-10-

provided, and we see no reason to address it further.[11] Thus, the primary issue we need to address here is whether the second requirement, i.e., whether Dr. Sarkar's claims could survive a motion for summary disposition pursuant to MCR 2.116(C)(8), is satisfied. We conclude that it is not.

As indicated above, a motion for summary disposition pursuant to MCR 2.116(C)(8) may be filed "when the opposing party has failed to state a claim on which relief can be granted." *Cooley*, 300 Mich App at 261. A motion for summary disposition pursuant to subsection (C)(8) "tests the legal basis of the complaint on the pleadings alone." *Id.* Therefore, all factual allegations made in the complaint must be viewed in a light most favorable to the nonmoving party and accepted as true. *Id.* at 261-262. "The trial court will grant the motion if the claim is so clearly unenforceable as a matter of law that no factual development could possibly justify the opposing party's right to recovery." *Id.* at 262.

In Michigan, a defamation claim requires proof of four elements:

"(1) a false and defamatory statement concerning the plaintiff, (2) an unprivileged communication to a third party, (3) fault amounting at least to negligence on the part of the publisher, and (4) either actionability of the statement irrespective of special harm (defamation per se) or the existence of special harm caused by publication." [*Smith*, 487 Mich at 113, quoting *Mitan v Campbell*, 474 Mich 21, 24; 706 NW2d 420 (2005).][12]

At issue on appeal is whether the statements identified in Dr. Sarkar's complaint are capable of defamatory meaning. "A communication is defamatory if it tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him" *Smith*, 487 Mich at 113 (citation and internal quotation marks omitted). "To be considered defamatory, statements must assert facts that are 'provable as false.'" *Ghanam*, 303 Mich App at 545, quoting *Milkovich v Lorain Journal Co*, 497 US 1, 19; 110 S Ct 2695; 111 L Ed 2d 1 (1990). "'The dispositive question . . . is whether a reasonable fact-finder could conclude that the statement implies a defamatory meaning.'" *Id.*, quoting *Smith*,

---

[11] The record reflects that a copy of the complaint filed by Dr. Sarkar in this action was posted to pubpeer.com. It also appears that this lawsuit, as well as the underlying allegation, has generated significant publicity in the cancer-research community. In sum, while neither party expressly agrees or disagrees that the "reasonable notice" requirement was satisfied, it appears insignificant and is largely irrelevant in light of our conclusion with respect to the second requirement.

[12] With respect to the third element, we would note that Dr. Sarkar appears to be a limited-purpose public figure. Thus, he is required to prove that the anonymous speakers acted with actual malice in making the statements at issue. *VandenToorn v Bonner*, 129 Mich App 198, 207; 342 NW2d 297 (1983). Nevertheless, because none of the comments at issue are capable of defamatory meaning, we need not address whether the record reflects any indication of actual malice.

487 Mich at 128. "The context and forum in which statements appear also affect whether a reasonable reader would interpret the statements as asserting provable facts," and this Court has recognized "that Internet message boards and similar communication platforms are generally regarded as containing statements of pure opinion rather than statements or implications of actual, provable fact." *Id*. at 546-547. "Whether a statement is actually capable of defamatory meaning is a preliminary question of law for the court to decide." *Id*. at 544.

Accordingly, to determine whether Dr. Sarkar's defamation claim could survive a motion for summary disposition pursuant to MCR 2.116(C)(8), we are tasked with analyzing each allegedly defamatory statement identified in his complaint, and we do so below.[13]

### I. PARAGRAPHS 41, 42, 44, 45, 46, 47, 50, 51, 52, 53, 54, 55, & 56

Paragraphs 41, 42, 44, 45, 46, 47, 50, 51, 52, 53, 54, 55, and 56 of Dr. Sarkar's complaint state, in full, as follows:

41. At https://pubpeer.com/publications/16546962 there are comments that conclude that certain figures are "identical" to others, accusing him of research misconduct.

42. At https://pubpeer.com/publications/21680704 there are comments that conclude that certain figures show "no vertical changes," are the "same bands," and are "identical" to others, also accusing him of research misconduct.

\* \* \*

44. At https://pubpeer.com/publications/2D67107831BCCB85BA8EC45A72FCEF, another discussion takes place among posters, accusing Dr. Sarkar of "sloppiness" of such magnitude that it calls into question the scientific values of the papers. The comments demand a "correction" with a "public set of data to show that the experiments exist," falsely stating that the data were false and that the experiments were fabricated.

---

[13] At the outset, it must be noted that facially deficient claims cannot survive a motion for summary disposition pursuant to MCR 2.116(C)(8) as a matter of law. *Ghanam*, 303 Mich App at 543. Thus, because " '[a] plaintiff claiming defamation must plead a defamation claim with specificity by identifying the exact language that the plaintiff alleges to be defamatory,' " our review as to whether statements are capable of defamatory meaning in order to survive a motion for summary disposition is limited to those statements that are specifically identified in the complaint. *Ghanam*, 303 Mich App at 543, quoting *Cooley*, 300 Mich App at 262 (alterations by the *Ghanam* Court). We have therefore elected to quote, *in full*, each paragraph at issue in Dr. Sarkar's complaint. We would also note, however, that we attempted to copy the formatting used by Dr. Sarkar in his complaint as closely as possible. Some spacing, however, differs minimally.

45.     An unregistered submission on the URL as #44 above doubts that the authors have taken "physics" and that they have decided to "show the world" fabricated data.  The same, or perhaps a different unregistered submission concludes:  "One has to wonder how this was not recognized earlier by the journals, reviewers, funding agencies, study sections, and the university.  Something is broken in our system."

46.     At https://pubpeer.com/publications/21680704, *"Inactivation of AR/TMPRSS2-ERG/Wnt signaling networks attenuates the aggressive behavior of prostate cancer cells,"* accusations include "no vertical changes … problematic," and "same image."

47.     On July 24, 2014, at https://pubpeer.com/publications/22806240, *"Activated K-Ras and INK4a/Arf deficiency promote aggressiveness of pancreatic cancer by induction of EMT consistent with cancer stem cell phenotype,"* a comment made from "Peer 3" contains the comment "There seems to be a lot more [']honest errors['] to correct," with the quotes communicating that they were not honest errors.

*  *  *

50.     The dialogue set forth in #49 above urges the PubPeer "community" to target Dr. Sarkar, and contains a false statement, as the Plaintiff has previously replied to PubPeer comments [November 10, 2013 submission apologizing for the inadvertent error and promising a correction at this page: https://pubpeer.com/publications/170E31360970BE43408F4AC52E57FD, *"CXCR2 Macromolecular Complex in Pancreatic Cancer:  A Potential Therapeutic Target in Tumor Growth."*]

51.     The interaction between anonymous posters in the paragraphs above suggests that multiple users are independently conversing about Dr. Sarkar and making false accusations about him.  On information and belief, these are from the same person pretending to have a dialogue with someone else, or persons working in concert.

52.     For example, a "dialogue" between two allegedly different posters took place on July 24, 2014.  These posters, "Peer 1" and "Unregistered Submission," each posted in the middle of the night, one responding to the other just 56 minutes later.                                                                        See: https://pubpeer.com/publications/A3845DA138FC83780CB5071ED74AEC, *"Concurrent Inhibition Of NF-Kappab, Cyclooxygenase-2, And Epidermal Growth Factor Receptor Leads To Greater Anti-Tumor Activity In Pancreatic Cancer."*  This is either a very odd coincidence that two scientists were independently reading the same page regarding Dr. Sarkar (in the example stated in this paragraph, a page regarding a 2010 paper that at the time had only had 151 views) – on the same day, in the middle of the night; or drawing a reasonable

-13-

inference from these facts, it's the same person feigning a dialogue; or two persons working in concert with one another.

53.    These probably fake dialogues are an attempt to falsely communicate that there are more scientists concerned about Dr. Sarkar, and more persons communicating accusations, than there actually are.  This is significant because there are so many criticisms of Dr. Sarkar that rely on the sheer number of PubPeer comments as an indication that he must be engaged in misconduct.  See, for example, the examples cited at paragraphs 40 (d) and 48, above.

54.    Another example of a tactic to artificially increase accusations of misconduct is to make a single comment on old papers.  Similar to what is stated in paragraph 53 above, this too is significant because there are so many comments that rely on the sheer number of *papers with comments* on PubPeer (as opposed to the total number of comments, *cf.* ¶ 53) to indicate misconduct:

    a.    There are two comments at this page: https://pubpeer.com/publications/5A875EBFF7D16C8CCE342257412E5B,    *"B-DIM Impairs Radiation-Induced Survival Pathways Independently Of Androgen Receptor Expression and Augments Radiation Efficacy in Prostate Cancer."*  These two comments are in April and July, 2014, concerning a 2012 paper with no previous comments.  This indicates someone intentionally seeking to increase the number of papers with comments on PubPeer.

    b.    Below is a comment simply inviting the reader to perform a search on                    Dr.                    Sarkar,                    at https://pubpeer.com/publications/58FE2E47C6FEB3BE00367F26BF7A83,    has nothing at all to do with that 1999 paper, but instead is intended for the reader to search and see how many of Dr. Sarkar's papers have been commented about on PubPeer:

    **Unregistered Submission:**
    (April 21st, 2014 1:33am UTC)

    1994-2014 here:
    https://pubpeer.com/search?q=Sarkar+FH

    c.    Another comment was made on July 24, 2014 at 7:04 AM from "Peer          1"          at          https://pubpeer.com/publications /997E578FC0B61F6BAE1974D4051157, *"Mitochondrial Dysfunction Promotes Breast Cancer Cell Migration and Invasion through HIF1α Accumulation via Increased Production of Reactive Oxygen Species."*  This doubled the amount of comments on this 2006 paper.

    d.    A July 13, 2014 comment was made about a 2005 paper that previously                    had                    no                    comments: https://pubpeer.com/publications/6B44D6D4111B59BAB78E642C8D1758,

*"Molecular Evidence for Increased Antitumor of Gemcitabine by Genistein in Vitro and in Vivo Using an Orthopedic Model of Pancreatic Cancer."*

e.      All told, there are 42 papers with Dr. Sarkar as lead researcher that have garnered only one comment on PubPeer, many of them extremely recent comments on relatively old papers.

55.      The comment that was made [as set forth in paragraph 54 (d)] appears innocuous on its face, merely stating that one illustration appears to be the same as another one, but "flipped."  This would meet PubPeer's guidelines that it was permissible to state that one illustration appears the same as another.  The comment is as follows:

**Unregistered Submission:**
(July 13th, 2014 6:26pm UTC)

Compare      Fig.      3B      and      Fig.      3D      [AT http://cancerres.aacrjournals.org/content/65/19/9064.full.pdf+html]

When Colo357 lane for 0 and 25 in 3B is flipped it looks similar to the control and genistein in Fig. 3D for Colo357.

56.      However, while that comment communicates that these are the same illustration, they are in fact not – they are clearly different illustrations to the untrained eye.  As such, this is another false accusation of research misconduct.  While some PubPeer comments do point out illustrations that appear similar, others like this example are not.  Accordingly, the comment set forth in this paragraph is false, made in bad faith, and defamatory.

After reviewing these paragraphs, we conclude that they are facially deficient and unable to survive a motion for summary disposition pursuant to MCR 2.116(C)(8).  As stated above, "[a] plaintiff claiming defamation must plead a defamation claim with specificity by identifying the exact language that the plaintiff alleges to be defamatory."  *Ghanam*, 303 Mich App at 543 (citation and internal quotation marks omitted).[14]  Here, minimal language is specifically identified in these paragraphs in the complaint, and Dr. Sarkar apparently relies on the trial court and this Court to visit pubpeer.com and learn the underlying science at issue to determine whether the statement constitutes a potentially defamatory accusation.  In essence, we would be

---

[14] See also *Royal Palace Homes, Inc v Channel 7 of Detroit, Inc*, 197 Mich App 48, 57; 495 NW2d 392 (1992) ("Plaintiffs must plead precisely the statements about which they complain."); *Gonyea v Motor Parts Fed Credit Union*, 192 Mich App 74, 77; 480 NW2d 297 (1991) ("These elements must be specifically pleaded, including the allegations with respect to the defamatory words, the connection between the plaintiff and the defamatory words, and the publication of the alleged defamatory words."); *Cooley*, 300 Mich App at 266 ("[U]nder Michigan law, the plaintiff must allege the exact defamatory statements.").

left searching the webpages that he cites to in hopes of finding comments that do or do not support his claim. This is his, not our, burden, and we decline to do so for him.[15] Thus, as identified in Dr. Sarkar's complaint, the statements at issue in paragraphs 41, 42, 44, 45, 46, 47, 50, 51, 52, 53, 54, 55, and 56 are not capable of defamatory meaning. Thus, defendants are entitled to summary disposition pursuant to MCR 2.116(C)(8) with respect to these paragraphs, and the trial court correctly granted PubPeer's motion to quash in this regard.[16]

## II. PARAGRAPHS 40(A), (B), AND (D), 43, 48, & 49

Paragraphs 40(a), (b), and (d), 43, 48, and 49 of Dr. Sarkar's complaint, however, identify, at least to an extent, the exact language at issue; thus, we are able to provide meaningful review.[17] These paragraphs provide, in full, as follows:

> 40. At and commenting from *"Down-regulation of Notch-1 contributes to cell growth inhibition and apoptosis in pancreatic cancer cells"* [https://pubpeer.com/publications/16546962]
>
> a. In this discussion, "Peer 1's" commentary begins with an invitation for the reader to compare certain illustrations with others. But then an unregistered submission links to another page, where someone sarcastically asserted that a paper "[Used] the same blot to represent different experiment(s). I guess the reply from the authors would be inadvertent errors in figure preparation."
>
> b. Perhaps that same unregistered submission complains, "You might expect the home institution to at least look into the multiple concerns which have

---

[15] To be clear, we are holding that Michigan law requires a plaintiff to specifically identify *every* statement that he or she claims is capable of defamatory meaning. Here, Dr. Sarkar quotes certain words, some phrases, and provides citations to various webpages. This is insufficient. Indeed, the majority of the webpages that Dr. Sarkar cites to have changed and no longer include the words or phrases that he quotes. For example, the webpage cited in in paragraph 41 of Dr. Sarkar's complaint includes approximately 63 comments, the majority of which were made after he filed the complaint in this case. The comments were made between November 2013 and October 2016, beginning with invitations to "please compare" certain figures that appear similar and ending with a link to an article on retractionwatch.com that summarizes a Wayne State University investigation finding that Dr. Sarkar had engaged in misconduct.

[16] Nevertheless, we do recognize that, ordinarily, a plaintiff may be given an opportunity to amend a facially deficient complaint. See MCR 2.116(I)(5). However, for the reasons discussed below, allowing Dr. Sarkar to do so in this case would be futile and is thus unnecessary.

[17] We should note that we are assuming, for purposes of paragraphs 40(a), (b), and (d), 43, 48, and 49, that Dr. Sarkar's complaint sufficiently identified the allegedly actionable statements. While we still believe that some of these paragraphs or subparagraphs are inadequate, we feel that we are able to provide meaningful review and choose to do so. Nevertheless, providing a citation to a webpage and quoting words or incomplete phrases is *not* sufficient.

-16-

been raised." *(sic)* This statement is defamatory. Given the regulatory scheme described above that requires such investigations only where there are "good faith" complaints of "alleged research misconduct" [deliberate fabrication, falsification, or plagiarism], this unknown author has accused Dr. Sarkar of deliberate misconduct.

* * *

d. The discussion that follows attack's [sic] Dr. Sarkar's character and expresses an invitation for his current employer (Wayne State), his potential future employer (the University of Mississippi), the National Institute of Health, and even the Department of Defense to investigate and take negative action against Dr. Sarkar:

**Unregistered Submission:**
(June 19th, 2014 1:11pm UTC)

Talking about the Board of Governors, see this public info

http://prognosis.med.wayne.edu/article/board-of-governors-names-dr-sarkar-a-distinguished-professor

**Peer 2:**
(June 19th, 2014 7:52pm UTC)

"currently funded by five National Institutes of Health RO1 grants"

That probably works out at about $200k per PubPeer comment. I should think that NIH must be pretty happy with such high productivity.

**Unregistered Submission:**
(June 20th, 2014 9:44am UTC)

just letting you know that the award for doing what he/she allegedly did is promotion a prestigious position at a different institution. Strange http://www.umc.edu/news_and_publications/thisweek.aspx?type=thisweek&date =6%2F9%2F2014 [*link is to the University of Mississippi site announcing Dr. Sarkar's hire*]

**Unregistered Submission:**

(June 20th, 2014 5:30pm UTC)

The last author is now correcting "errors" in several papers. Hopefully he will be able to address and correct the more than 45 papers (spanning 15 years of concerns: 1999-2014), which were all posted in PubPeer.

**Peer 2:**

(June 20th, 2014 6:39pm UTC)

From the newsletter:

"Sarkar has published more than 525 scholarly articles"

… nearly 50 of which have attracted comments on PubPeer!

It's not hard to imagine why Wayne State may not have fought to keep him. And presumably the movers and shakers at the University of Mississippi Medical Center didn't know that they should check out potential hires on PubPeer (they just counted the grants and papers). I wonder which institution gets to match up NIH grants with papers on PubPeer.

It can only be a matter of time, grasshopper, but that time may still seem long. You saw it first on PubPeer.

…

**Unregistered Submission:**

(July 5th, 2014 12:58am UTC)

From a look at this PI's funding on NIH website it seems this lab has received over $13 million from NIH during the last 18 years. An online CV shows he has received DOD funds as well, bring the federal fund close to $20 million. Why isn't the NIH and DOD investigating? The problems came to light only because they were gel photos. What else could be wrong? Figures, tables could be made-up or manipulated as well.

The problems on PubPeer is for about 50 papers-all based on image analysis. That is just 10% of the output from this lab (or $2 million worth of federal dollars). What about the other 90%? Sadly this is what happens when research output becomes a numbers game. An equivalent PI would be happy to have just 50 high impact papers properly executed, that moves the research field forward. This lab has 500; but now it will be very difficult to figure out the true scientific value of any of them. Sad!

\* \* \*

43.    At https://pubpeer.com/publications/22806240, there are comments that state:  "You are correct:  using the same blot to represent different experiment(s). I guess the reply from the authors would be "inadvertent errors in figure preparation," which also accuse him of research misconduct and sarcastically noting that any defense to the contrary would be inadequate.

\* \* \*

-18-

48. At
https://pubpeer.com/publications/88B8619C6BD964F6EDDD98AD8ECE47,
*"Inhibition of Nuclear Factor Kappab Activity by Genistein Is Mediated via Notch-1 Signaling Pathway in Pancreatic Cancer Cells,"* a discussion takes place between an unregistered submitter and "Peer 1," accusing significant misconduct, as follows:

> **Unregistered Submission:**
> (March 29th, 2014 11:20pm UTC)
> The last author has more than 20 papers commented in Pubpeer.
>
> **Peer 1:**
> **(**March 30th, 2014 10:07am UTC)
> "The last author has more than 20 papers commented in Pubpeer."
>
> He's been very productive.
>
> Presumably the journals know and his university knows.  How long would it have taken for you to find out from them?  Still counting.
>
> **Unregistered Submission:**
> (May 17th, 2014 7:38pm UTC)
>
> An Erratum to a report this previous PubPeer comment has been published by the authors in Int J Cancer.  2014 Apr 15;134(8):E3.  In the erratum, the authors state that:  "An error occurred during the creation of the composite figure for Fig-5B (Rb) and Fig-6B (I?B?) which has recently been uncovered although it has no impact on the overall findings and conclusions previously reported"
>
> Not so fast!
>
> See additional concerns (band recycling, not addressed in Erratum) in Figure 4A and Figure 6; here:
>
> > http://imgur.com/LVa2cVc
> > http://i.imgur.com/4ARd2Mp.png
> > http://i.imgur.com/miK0HGw.png
>
> Based on these issues, can we agree with the authors that "an ERROR occurring during the creation of the composite figures" and that these (and previous "errors" have "NO IMPACT on the overall findings and conclusions previously reported"?

49. At
https://pubpeer.com/publications/0189A776A6094A60759DB718F9C535,
*"Foxm1 Is a Novel Target of a Natural Agent in Pancreatic Cancer,"* there are two comments that seem to be finishing each other's thought:

**Unregistered Submission:**
(July 23rd, 2014 6:37pm UTC)

FH Sarkar has never replied to any of the Pubpeer comments.

**Peer 1:**
(July 23rd, 2014 10:31pm UTC)

but if we send our concerns to his institution and the journals involved, hopefully there will be changes…

Assuming that these paragraphs are facially sufficient, we nevertheless conclude that they are also unable to survive a motion for summary disposition pursuant to MCR 2.116(C)(8). While we are unable to find any Michigan caselaw specifically addressing comments of this nature, other jurisdictions, both federal and state, have addressed similar issues on many occasions. In doing so, they have recognized "that when a speaker outlines the factual basis for his conclusion, his statement is protected by the First Amendment." *Partington v Bugliosi*, 56 F3d 1147, 1156 (CA 9, 1995).[18]  This is true even if the speaker expresses his or her opinion

---

[18] While not binding, we are permitted to consider caselaw from other jurisdictions as persuasive. *Travelers Prop Cas Co of America v Peaker Servs, Inc*, 306 Mich App 178, 188; 855 NW2d 523 (2014) (citation omitted).  We find the Ninth Circuit's reasoning persuasive and quote it at length below:

> Reading each of the statements in context, we find that the statements themselves, as well as the implications that Partington attributes to them, do not represent assertions of objective fact.  When one reads the first passage in context, it is clear that Bugliosi does not claim to know the reason for the defense lawyers' failure to bring out the existence of the contradiction; rather, he speculates on the basis of the limited facts available to him.  The passage clearly represents Bugliosi's personal interpretation of the available information and not a verifiable factual assessment of Partington's conduct.  As the Seventh Circuit has noted:

>> A statement of fact is not shielded from an action for defamation by being prefaced with the words "in my opinion," but if it is plain that the speaker is expressing a subjective view, an interpretation, a theory, conjecture, or surmise, rather than claiming to be in possession of objectively verifiable facts, the statement is not actionable.

> With regard to the second statement, Bugliosi merely outlines a set of facts, allowing the reader to draw his own conclusion about them.  Even if we were to attribute to Bugliosi's statement the implication that Partington contends arises from it—that Partington represented his client poorly—Bugliosi can only be said to have expressed his own opinion after having outlined all of the facts that serve as the basis for his conclusion.

anonymously. *Cooley*, 300 Mich App at 256. Each of the paragraphs above reflect the speaker's opinion based on underlying facts that are available to readers. Specifically, Dr. Sarkar expressly admits in his complaint that the comment at issue in subparagraph 40(a) "begins with an invitation for the reader to compare certain illustrations with others," the comment at issue in subparagraph 40(b) was in response to the same underlying facts as subparagraph 40(a), and the comment at issue in subparagraph 40(d) as in response to those underlying facts as well. Similarly, the comments at issue in paragraphs 43, 48, and 49 are all also part of discussions based on underlying facts that are available on the same webpages on pubpeer.com. This is precisely the type of opinion that state and federal courts have consistently held was protected by the First Amendment, and we believe the same should be true in Michigan as well. Thus, summary disposition pursuant to MCR 2.116(C)(8) was appropriate with respect to paragraphs 40(a), (b), and (d), 43, 48, and 49, and the trial court correctly granted PubPeer's motion to quash in this regard.

### III. PARAGRAPH 40(C)

In light of our conclusions above, we are left with only one subparagraph—subparagraph 40(c)—that Dr. Sarkar alleges is capable of defamatory meaning. Indeed, it is this subparagraph, and only this subparagraph, that the trial court concluded was capable of defamatory meaning, and it is this subparagraph that is at issue in PubPeer's cross-appeal in Docket No. 326691. Subparagraph 40(c) of Dr. Sarkar's complaint provides, in entirety, as follows:

---

The courts of appeals that have considered defamation claims after *Milkovich* have consistently held that when a speaker outlines the factual basis for his conclusion, his statement is protected by the First Amendment. As the Fourth Circuit noted, "[b]ecause the bases for the . . . conclusion are fully disclosed, no reasonable reader would consider the term anything but the opinion of the author drawn from the circumstances related." Similarly, the District of Columbia Circuit has noted that " '[b]ecause readers understand that such supported opinions represent the writer's interpretation of the facts presented, and because the reader is free to draw his or her own conclusions based on those facts, this type of statement is not actionable in defamation.' " Finally, the First Circuit has held that, as long as the author presents the factual basis for his statement, it can only be read as his "personal conclusion about the information presented, *not as a statement of fact*."

* * *

Thus, we join with the other courts of appeals in concluding that when an author outlines the facts available to him, thus making it clear that the challenged statements represent his own interpretation of those facts and leaving the reader free to draw his own conclusions, those statements are generally protected by the First Amendment. [*Partington*, 56 F 3d at 1156-1157 (citations omitted; alterations and emphasis by the *Partington* Court).]

-21-

c. Then an unregistered user (likely the same one, given the context) reveals that s/he is either a person at Wayne State University who made a formal complaint against Dr. Sarkar, or is otherwise privy to the a [sic] person who did so:

> **Unregistered Submission:**
> (June 18th, 2014 4:51pm UTC)
>
> Has anybody reported this to this institute?
>
> **Unregistered Submission:**
> (June 18th, 2014 5:43pm UTC)
>
> Yes, in September and October 2013 the president of Wayne State University was informed several times.
>
> The Secretary to the Board of Governors, who is also Senior Executive Assistant to the President Wayne State University, wrote back on the 11th of November 2013:
>
> "Thank you for your e-mail, which I have forwarded to the appropriate individual within Wayne State University. As you are aware, scientific misconduct investigations are by their nature confidential, and Wayne would not be able to comment on whether an inquiry is under way, or if so, what its status might be.["]
>
> "Thank you for bring this matter to our attention."

On appeal, Dr. Sarkar claims that the trial court's decision with respect to paragraph 40(c) was correct because the statement at issue "is a clear indication that [the speaker] is alleging that Dr. Sarkar committed research misconduct – which is a public accusation at the very heart of Dr. Sarkar's case (and contrary to PubPeer's denials that such an accusation was never made on their web site)." The trial court apparently agreed to an extent, opining that "there could be an inference that this was of a nature to attempt to defame Dr. Sarkar." Ultimately, it appears that Dr. Sarkar argues and the trial court concluded that these statements, in context and when coupled with the public disclosure of the email from Wayne State University, are capable of defamatory meaning. We cannot agree with this reasoning.

The contents of the email, even when released to the public, are no more defamatory than the other comments discussed above. It reflects, drawing inferences in a light most favorable to Dr. Sarkar, *Cooley*, 300 Mich App at 261-262, that the email sender, i.e., the individual from Wayne State University, was "not . . . able to comment on whether an inquiry [presumably a scientific misconduct inquiry] is under way, or if so, what its status might be." Other than reaffirming the intent of the speaker, i.e., the PubPeer commenter, the publication of this email did not make any false assertions that were otherwise capable of defamatory meaning. As indicated above and below, "when a speaker outlines the factual basis for his conclusion, his statement is protected by the First Amendment," *Partington*, 56 F3d at 1156. This is true regardless of whether the speaker later publicizes his or her actions that he or she took based on that subjective opinion. Accordingly, we disagree that the statements at issue in subparagraph

-22-

40(c) are sufficient to survive summary disposition or entitled Dr. Sarkar to learn the identities of the anonymous speakers. Thus, the trial court should have granted summary disposition and PubPeer's motion to quash with respect to subparagraph 40(c) as well.[19]

## IV. THE STATEMENTS AS A WHOLE

Dr. Sarkar additionally argues that, while perhaps the individual statements, taken in isolation, do not appear capable of defamatory meaning, a reasonable person reviewing the entirety of the comments regarding Dr. Sarkar's research on pubpeer.com would find them defamatory. In essence, it is Dr. Sarkar's position that all criticism of his research on PubPeer is defamatory and therefore not protected by the First Amendment. For similar reasons as those articulated with respect to paragraphs 40, 43, 48, and 49, we also conclude that the anonymous speakers' criticism of Dr. Sarkar's research, even when reviewed as a whole and in the appropriate context, is not capable of a defamatory meaning.

As stated above, the First Amendment protects an individual's right to speak anonymously. *Cooley*, 300 Mich App at 256. However, defamatory statements are not entitled to this same protection. *Ghanam*, 303 Mich App at 534. "To be considered defamatory, statements must assert facts that are 'provable as false.' " *Id*. at 545. Nevertheless, state and federal courts alike have consistently held "that when a speaker outlines the factual basis for his conclusion, his statement is protected by the First Amendment," *Partington*, 56 F3d at 1156. That is, when a speaker presents a factual basis for the opinion he or she reached, his or her opinion is not capable of defamatory meaning. *Id*.

Applying those rules to the facts of this case, we cannot conclude that the comments made on pubpeer.com regarding Dr. Sarkar are capable of defamatory meaning. In short, Dr. Sarkar is asking this Court to hold that the anonymity of individuals who engage in critical discussions of his work is not protected by the First Amendment, and we simply cannot do so. Had this been a situation where, for example, speakers falsely stated that he was found guilty of research misconduct, our conclusion may well have been different. *But that is not what is before us*. Rather, the situation before us involves critical discussions between anonymous individuals that are, at least to some extent, critical of Dr. Sarkar's research. At best, some of the speakers opine that Dr. Sarkar *should* be investigated for research misconduct, and their opinions in that regard are protected by the First Amendment. Indeed, their discussions repeatedly invite readers to review Dr. Sarkar's research for themselves and reach their own conclusions, and we are not inclined to chill this type of constitutionally protected speech. Accordingly, for the reasons set

---

[19] Dr. Sarkar has also raised the idea that, by quoting the email in a public post on pubpeer.com, the commenter violated various federal laws involving the confidentiality of research-misconduct investigations. However, he fails to fully develop this argument as well as to provide sufficient legal support for his claim so as to allow us to provide meaningful review. Thus, we deem it abandoned. *Peterson Novelties, Inc v City of Berkley*, 259 Mich App 1, 14; 672 NW2d 351 (2003). In any event, we do not believe that the public disclosure of this email, alone, constitutes a violation of any federal laws involving confidentiality in research-misconduct investigations. See, e.g., 42 CFR 93.108 (2005).

forth above, we conclude that summary disposition pursuant to MCR 2.116(C)(8) with respect to the comments made on pubpeer.com regarding Dr. Sarkar is appropriate.[20] For similar reasons, PubPeer's motion to quash should have been granted in full.

## V. THE FLYER

As indicated above, we conclude that none of the statements from pubpeer.com identified, whether specifically or implicitly, in Dr. Sarkar's complaint are not capable of defamatory meaning. Thus, with respect to those statements, summary disposition pursuant to MCR 2.116(C)(8) is appropriate. However, the flyer that was allegedly distributed to Wayne State University personnel presents a different issue. According to Dr. Sarkar, the distributed flyer implied that he was under senatorial investigation when he was, in fact, not. Taking that as true, we agree that summary disposition pursuant to MCR 2.116(C)(8) with respect to Dr. Sarkar's defamation claim based on that flyer is inappropriate at this time. With that being said, it is still necessary for us to determine whether, and to what extent, Dr. Sarkar is permitted to unmask the identities of commenters on pubpeer.com as it relates to that flyer, and it is our view that he is not entitled to unmask the identities of any of those commenters. Stated simply, there is no reasonable connection between the flyer and pubpeer.com. The only connection between the two is the fact that the flyer included a screenshot of a webpage on pubpeer.com; however, pubpeer.com is a public website available to, *literally*, everyone. While Dr. Sarkar asks that we assume that the flyer was likely distributed by someone who criticized his research on pubpeer.com and therefore unmask the identities of all the individuals who have commented on his research on that website, we simply cannot do so. In short and as indicated above, individuals are entitled to make anonymous statements under the First Amendment, and the mere fact that someone later prints some of those anonymous statements and distributes them does not suddenly destroy that protection. Accordingly, we conclude that, while Dr. Sarkar's defamation claim may nevertheless proceed, he is not entitled to discovery from PubPeer in this regard.

## B. EVIDENCE BEYOND THE PLEADINGS

On appeal, Dr. Sarkar also argues that the trial court's March 9, 2015 order must be reversed because the court erred in considering affidavits, erred in making factual inferences against him, and erred in requiring the production of evidence. In essence, Dr. Sarkar argues that the trial court misapplied MCR 2.116(C)(8) under *Ghanam*. As stated in greater detail above, a motion for summary disposition pursuant to MCR 2.116(C)(8) may be filed "when the opposing party has failed to state a claim on which relief can be granted." *Cooley*, 300 Mich App at 261. Such a motion "tests the legal basis of the complaint on the pleadings alone." *Id*. This standard requires that all factual allegations made in the complaint be viewed in a light most favorable to the nonmoving party and accepted as true. *Id*. at 261-262.

---

[20] See also *Orr v Argus-Press Co*, 586 F2d 1108, 1114-1115 (CA 6, 1978) (differentiating between stating "that the plaintiff sits around in his back yard with a drink in his and therefore must be an alcoholic," which is "not actionable," and stating "that the plaintiff is an alcoholic," which is actionable. (Citation and internal quotation marks omitted.)

-24-

## 1. AFFIDAVITS

As indicated above, Dr. Sarkar claims on appeal that the trial court impermissibly considered two affidavits in reaching its decision, which is undisputedly prohibited by MCR 2.116(C)(8). However, Dr. Sarkar does not point to anything in the record to support his claim that the trial court actually considered these affidavits in reaching its decision.[21] Thus, this argument is abandoned. *Peterson Novelties, Inc*, 259 Mich App at 14. Moreover, we are unable to find any mention of these affidavits by the trial court in the entire record. Thus, this claim of error is meritless.

## 2. FACTUAL INFERENCES

As indicated above, Dr. Sarkar also claims on appeal that the trial court impermissibly made factual inferences against him, which is also undisputedly prohibited by MCR 2.116(C)(8). Again, however, Dr. Sarkar does not point to anything in the record to support his claim that the trial court made any factual inferences against him.[22] Thus, this argument is abandoned as well.

---

[21] Dr. Sarkar argues, in pertinent part, as follows:

> The court's error in considering (C) (8) factors was compounded when it considered the affidavit of Dr. Krueger (opining about Dr. Sarkar's research) attached to PubPeer's motion. Even assuming *arguendo* that the court were permitted to consider (C) (8) factors on the motion to quash, MCR 2.116 does not permit reference to affidavits in determining a (C) (8) motion by its plain language: "Only the pleadings may be considered when the motion is based on subrule (C)(8) or (9)."
>
> * * *
>
> As argued above, because there was an appearing defendant, PubPeer was not permitted under *Cooley* to argue the standards of MCR 2.116 (C) (8). The error was exacerbated by PubPeer's submission of two affidavits in support of their motion. They may not submit them, and this court may not consider them. Specifically, their expert's affidavit must be completely disregarding, and it is not harmless, because its focus was that the anonymous commenters' statements were substantially true and not defamatory – an argument the lower court considered.

As is obvious from the quoted text above, Dr. Sarkar points to nothing in the record to support his claim that the trial court consider these affidavits. In essence, Dr. Sarkar asks this Court to assume that, because they are included in the record, the trial court impermissibly relied on them, and that is certainly not an assumption we are willing to make.

[22] Dr. Sarkar argues, in pertinent part, as follows:

> Furthermore, clear precedent requires that all factual allegations and the inferences to be drawn from there are to be taken in the light most favorable to the non-moving party and taken as true. However, the court's remarks at oral

*Peterson Novelties, Inc*, 259 Mich App at 14. Moreover, as with his argument with respect to the affidavits, we are unable to find any indication in the record that the trial court made any factual inferences in one party's favor over the other. Thus, this claim of error is also meritless.

### 3. PRODUCTION OF EVIDENCE

Additionally, Dr. Sarkar argues that the trial court's March 9, 2015 order must be reversed because the court required that he produce evidence in support of his claims.[23] This claim of error is meritless as well. While it is true that the trial court requested that Dr. Sarkar's counsel provide PubPeer's counsel with a copy of the distributed document, Dr. Sarkar does not cite, and we are unable to find, any authority to support the proposition that this request requires reversal. Thus, this argument is also abandoned. *Peterson Novelties, Inc*, 259 Mich App at 14. Furthermore, Dr. Sarkar's attorney expressly stated that he was "happy" to allow PubPeer's counsel an opportunity to review this document. Consequently, even if not abandoned, we deem the issue waived. *The Cadle Co v City of Kentwood*, 285 Mich App 240, 254-255; 776 NW2d 145 (2009). Moreover, this request, which appears to have been made for convenience purposes only, i.e., to allow PubPeer's counsel to know what document Dr. Sarkar's counsel was referring to, has no impact on the application of the First Amendment in this matter.

---

argument repeatedly assumed an interpretation of the pleadings favorable to the defendant. That is improper when considering the pleadings alone.

\* \* \*

As argued in the first section, because there was an appearing defendant, PubPeer was not permitted under *Cooley* to even argue the standards of MCR 2.116 (C) (8). The error was compounded by the court's interpretation of all of Dr. Sarkar's factual allegations, and the inferences therefrom, in a light favorable to PubPeer.

Again, Dr. Sarkar points to nothing in the record to support his claim that the trial court made factual inferences against him other than to generally point to the tone of the trial court's "remarks." In essence, Dr. Sarkar is asking us to search the record for him in hopes of finding something that supports this assertion, and it is not our duty to do so.

[23] Specifically, Dr. Sarkar argues, in entirety, as follows:

PubPeer argued, and the court agreed, that plaintiff was required to produce evidence at this stage, to wit: the document that suggested Dr. Sarkar was under U.S. Senate inquiry. The transcript will indicate that after the court directed plaintiff produce this document, a copy was handed over on the record to the attorneys for PubPeer. For the same reasons set forth above, that any analysis under MCR 2.116 (C) (8) must be based on the pleadings alone, this was plain error.

## C. REMAINING CAUSES OF ACTION

On appeal, Dr. Sarkar lastly argues that the trial court's March 9, 2015 order must be reversed because the court did not separately consider his other four causes of action. Specifically, Dr. Sarkar contends that, assuming that the First Amendment prohibits the unmasking of the identities of the anonymous commenters with respect to his defamation claim, he is nevertheless entitled to learn their identities with respect to his other four claims. However, First Amendment protections "are not exclusive to defamation claims." *Ireland v Edwards*, 230 Mich App 607, 624; 584 NW2d 632 (1998). That is, the same First Amendment protections apply whether Dr. Sarkar is trying to unmask the speakers' identities in a defamation lawsuit or any other type of lawsuit. *Id*.[24] To the extent Dr. Sarkar claims that the defamation claim is distinguishable from the others because the others rely solely on conduct completely separate from the comments on pubpeer.com, we agree that summary disposition pursuant to MCR 2.116(C)(8) in that respect would be improper.[25] However, like with the flyer, any conduct that is completely separate from the comments on pubpeer.com is not reasonably connected so as to allow discovery of the anonymous speakers' identities. Thus, while the other claims may proceed, PubPeer's motion to quash with respect to those claims was nevertheless properly granted. See *Hustler Magazine, Inc v Falwell*, 485 US 46, 56; 108 S Ct 876; 99 L Ed 2d 41 (1988) ("We conclude that public figures and public officials may not recover for the tort of intentional infliction of emotional distress by reason of publications such as the one here at issue without showing in addition that the publication contains a false statement of fact that was made with 'actual malice' . . . .").[26]

---

[24] Stated differently, where the alleged tortious conduct "is a defendant's utterance of negative statements concerning a plaintiff, privileged speech is a defense." *Lakeshore Community Hosp, Inc v Perry*, 212 Mich App 396, 401; 538 NW2d 24 (1995).

[25] It should be noted, however, that Dr. Sarkar's complaint does *not* identify completely separate conduct as he claims. Rather, his complaint expressly identifies the comments on pubpeer.com as the basis or at least as part of the basis for more than just his defamation claim. For example, while Dr. Sarkar claims that the additional causes of action cite completely separate conduct, his intentional infliction of emotional distress claim expressly relies on "false statements made on PubPeer[.]" Thus, we feel it necessary to clearly state that, to the extent his other causes of action rely in any way upon the statements made on pubpeer.com, those causes of action may not proceed on remand because they are premised on constitutionally protected speech.

[26] Relatedly, we completely reject the idea that only the defamation claim is subject to First Amendment limitations. Using that logic, if Dr. Sarkar simply dismissed his defamation claim and continued with the other four claims with respect to the statements on pubpeer.com, there would be no First Amendment protection, and that is directly contrary to the United States and Michigan Constitutions as well as Michigan's, other states', federal, and United States Supreme Court caselaw.

## III. CONCLUSION

Accordingly, the trial court's March 5, 2015 and March 19, 2015 orders are affirmed in part and reversed in part, and this matter is remanded for further proceedings consistent with this opinion. Specifically, the trial court's March 5, 2015 order partially granting summary disposition to defendants and partially granting PubPeer's motion to quash is affirmed, and its March 19, 2015 order denying summary disposition to defendants and denying PubPeer's motion to quash with respect to subparagraph 40(c) is reversed. Nevertheless, to the extent either order dismissed Dr. Sarkar's defamation claim with respect to the distributed flyer or his intentional interference with a business expectancy, intentional interference with a business relationship, invasion of privacy, or intentional infliction of emotional distress claims, we conclude that the trial court did so erroneously. Those claims may proceed; however, we hold that Dr. Sarkar is not entitled to unmask the identities of any speakers on pubpeer.com with respect to those claims due to the anonymity protections afforded by the First Amendment.

Affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion. As the prevailing party, PubPeer may tax costs pursuant to MCR 7.219.


/s/ Colleen A. O'Brien
/s/ Karen M. Fort Hood
/s/ Elizabeth L. Gleicher

-28-